## Brandt and Hummel *versus* The Commonwealth.

1. Under the forty-fourth section of the Criminal Procedure Act one who is an accessory before the fact may be charged as a principal in an indictment for murder: Campbell *v.* The Commonwealth, 3 Norris 187, followed.

2. Where several men are indicted for murder, and they waive a demand for a separate trial, it is competent for the Commonwealth to introduce any evidence that tends to prove the guilt of any one of the defendants, although it might incidentally prejudice the others on trial.

3. Several men were indicted for murder. It was alleged by the Commonwealth that two of these men murdered the deceased in furtherance of a nefarious speculation in human life; that while two had committed the murder, the others had procured policies of insurance on the life of the deceased, and hired the two to commit the deed in order to procure the insurance money. They all elected to be tried together. *Held*, that it was competent for the Commonwealth to introduce any testimony that tended to prove the guilt of either of the parties on trial.

4. The ingredients of murder in the first degree proved in this case.

January 5th 1880.   Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ.   GREEN, J., absent.

Error to the Court of Oyer and Terminer of *Lebanon county:* Of May Term 1880, No. 38.   Certified from the Middle District.

Indictment of Israel Brandt and Josiah Hummel for the murder of Joseph Raber.

The following was the form of the indictment:

" In the Court of Oyer and Terminer and General Jail Delivery for the county of Lebanon, of April Term A. D. 1879.

LEBANON COUNTY ss.

The Grand Inquest of the Commonwealth of Pennsylvania, inquiring in and for the body of the county of Lebanon, upon their oaths and affirmations respectively, do present: That Charles Drews, yeoman, late of the county aforesaid, Frank Stichler, yeoman, late of the county aforesaid, Henry Wise, yeoman, late of the county aforesaid, Josiah Hummel, yeoman, late of the county aforesaid, Israel Brandt, yeoman, late of the county aforesaid, and George Zechman, yeoman, late of the county aforesaid, to wit: on the seventh day of December, in the year of our Lord one thousand eight hundred and seventy-eight, at the county aforesaid, and within the jurisdiction of this court, with force and arms, &c., in and upon the body of one Joseph Raber, in the peace of God and the said Commonwealth, then and there being, feloniously, wilfully and of their malice aforethought, did make an assault, and him, the said Joseph Raber, then and there feloniously, wilfully and of their malice aforethought, did kill and murder, contrary to the form of the Act of the General Assembly in such case made and provided, and against the peace and dignity of the Commonwealth of Pennsylvania."

[Brandt *v.* Commonwealth.]

At the trial before Henderson, A. L. J., the following facts were disclosed by the testimony : In the autumn of 1878, Joseph Raber, a man about sixty years of age, lived in a shanty on the Blue Mountain, in Indiantown Gap, Lebanon county. He was very poor, and was engaged in no business, depending entirely for support on his daily labor and the charity of his neighbors. Israel Brandt lived about three-fourths of a mile from Raber's shanty at a place known as St. Joseph's Spring. Brandt's house· had been used as a hotel at some previous time, but·at this time was not licensed. Charles Drews lived about two hundred yards from Brandt. Henry Weise, Josiah Hummel and George Zechman lived down the valley, along the mountain, from four to six miles away.

In the latter part of July 1878, Israel Brandt and Josiah Hummel (the defendants) together with Henry Weise and George Zechman, agreed to procure the insurance of Raber's life for their benefit. They accordingly applied to George W. Scweinhard, an insurance agent, living in Lebanon, for the purpose of having applications made out to procure insurance on the life of Raber. Schweinhard met Brandt and Weise, with Raber, at the house of Brandt in the beginning of August, at which time applications were made out for insurance, and the necessary entrance fees paid by Weise. Some time after, when the applications had been favorably considered by the insurance companies and policies had been issued, on receipt of a letter from Weise, Schweinhard met Brandt, Hummel, Weise, Zechman and Raber, at Lebanon, "for the purpose of having the assignments made of the policies that were on hand, and having more applications taken out" on the life of Raber. At that time the policies then on hand were assigned to the parties above named, by Raber ;· among others, a policy for $2000 in the Home Mutual Life Association to Josiah Hummel, and a policy for $1000 in the New Era Life Insurance Company to Israel Brandt. There were two other policies on hand amounting to $5000, one of which was assigned to George Zechman and the other to Henry Weise, making the whole amount of insurance at that time on hand, and assigned to the said parties, $8000. At the same time they told Schweinhard that Raber was a very poor man, and that they had agreed to support him during life and see him decently buried after his death.

The insurance having been thus secured, the parties met frequently at Brandt's ; were often seen together; sometimes one or two ; sometimes more, on the public road going ·to and from the direction of Brandt's, and differed from others who were present in their actions, by calling each other aside and consulting together apart. This conduct was noticed, and continued for and during three or four months before the death of Raber, after which it ceased.

Charles Drews, the neighbor of Brandt, had no insurance upon the life of Raber, but proposed to Frank Stichler that he should

assist him to kill Raber, and when Stichler inquired why he wished him killed, he gave as a reason that he was highly insured. The plan then agreed upon was to drown him in Kitzmiller's dam. Raber was to be asked to go with them to fish in the dam. They were to take the flat. Drews was to push Raber off the flat, and then Stichler was to pole over him and drown him; after which Stichler was to jump into the water, get wet, and then go to Michael Kohr's, who lived near the dam, for a change of clothes, and say that he had gotten wet in trying to save Raber from drowning. Drews was to give Stichler $100 for this service. This was about two weeks before the alleged murder of Raber. Brandt and Hummel visited the dam together about this time. Brandt afterwards urged Stichler to comply with Drews's request, saying that Drews was to get $300 for doing it, and that if Stichler helped, he, Brandt, would give him a good share, and each of the others would have to do so also. He further told Stichler that they had this thing going on for three months; that they first intended to chloroform him, but that he, Brandt, had struck upon the plan to drown him. Frank Stichler did not assist, and after the death of Raber, Brandt told him that if he said anything about the matters he had told him, he, Stichler, would be a dead man. In the latter part of November, or the beginning of December 1878, Joseph F. Peters, a son-in-law of Drews, who had before that time enlisted in the army of the United States, returned home, and took up his residence with Drews. A short time after he arrived—perhaps within a day or two—Drews told him, while chopping wood on the mountain, that he was to receive $1500 for killing Raber from Brandt and Hummel, amongst others, and wanted him to join in the killing. About the same time, Brandt quarrelled with Joseph Peters's wife, because, as he said, she prevented Drews and Stichler from killing Raber, and Weise also came to Drews and gave him notice that he must kill Raber before Friday or Saturday of that week. On the 7th of December 1878 Drews went to Raber's shanty and asked him to come down to his house for tobacco. Drews left for his home, and Raber followed him. When Raber arrived at Drews's he was induced to go over to Kreiser's, which necessitated the crossing of Indiantown Creek. The creek was crossed by means of a plank, and at the plank was about twelve feet wide and seventeen inches deep. Drews and Stichler were seen accompanying him down from the house of Drews, through the fields, until they reached the creek. Stichler went first, Raber next, and Drews brought up the rear. When Raber reached the middle of the plank, crossing the creek, Stichler turned around and put his hands on Raber's shoulders, tripped him, and threw him into the creek. This was between 4 and 5 o'clock in the afternoon. In a few minutes Drews and Stichler were seen return-

ing to the house of Drews without Raber.   They entered the front
room, and Stichler began to take off his clothes, which were wet.
He directed Mrs. Drews, who supplied him with dry clothes, to
hang his wet ones up to dry, and if any one came in, to remove
them, so that they would not be seen.   Both Stichler and Drews
spoke of the difficulty they had experienced in holding the old
man down and drowning him.   About 6 o'clock the neighbors
were notified by Brandt and his son that Raber was drowned
in the creek.   Perhaps a dozen assembled and looked at the body
of Raber, which was lying in the water, but they did not remove
the body.   Raber was dead.

Hummel and Brandt went to Lebanon for the coroner that
night.   Brandt became considerably intoxicated, and boasted to
the coroner that they had insurances on the life of Raber to the
amount of $20,000, and offered him $20 each to make a good
report.

Some days after the murder, Hummel told Drews, in a conver-
sation about Raber, that when he got his money for drowning
Raber, he had better leave that part of the country, or the people
might find it out.   Drews also detailed to Hummel the story he
gave out as to how Raber was drowned, and cautioned Hummel
about letting anything be found out.   Hummel assured him it
should not be found out through him.   Drews also, in a conversa-
tion with his wife, after the drowning, in the course of which she
expressed some doubt as to his getting the money that had been
promised to him for killing Raber, said that there was no doubt
about his getting it; they had bound themselves together by too
hard a bargain, and the first who backed out would be shot.   This
had been agreed upon before they insured Raber.

On the 10th of December, Raber was buried, and on the 13th
of December, Schweinhard met Brandt, Hummel, Weise and
Stichler at Brandt's house, and made out proofs of death for
Brandt, Hummel and Weise, on the policies they held, or claimed
to hold.   At this time the expression of Stichler was made, which
is made the 3d assignment of error below.

Information was afterwards made against Charles Drews, Frank
Stichler, Israel Brandt, Josiah Hummel, Henry Weise and George
Zechman, for the murder of Raber.   They were arrested, indicted
and elected to be tried together, and were found guilty of murder
in the first degree.   Sentence of death was pronounced, and then
Brandt and Hummel sued out this writ of error.

The following assignments of error will show the various ques-
tions raised in the case.

1. The court erred in admitting the following offer of testimony
on the part of the Commonwealth: Lena Peters having testified
that her father had stated in her presence and hearing that he
was to be paid $1500 for drowning Raber, it was proposed to

ask her: "Please tell from whom your father said he was to have the $1500 for drowning Raber." This for the purpose of showing, in connection with the testimony already in the case against Brandt, Hummel and Weise, the motive for drowning Raber, and showing the conspiracy of the said Drews, Stichler, Brandt and Weise, Hummel and Zechman, the defendants, to murder Raber and secure the proceeds of the insurances on Raber's life.

Objected to. 1st. That the testimony is inadmissible for the purpose of proving a conspiracy, it being one of the acts of a conspiracy already formed. The Commonwealth has neither proven a conspiracy nor identified any persons connected therewith. Until that has been done, the evidence cannot affect any of them, but co-conspirators, of which there is no evidence at all. 2d. To admit this testimony at this time would be presuming a conspiracy, of which there is no evidence. 3d. That for the purpose of showing a motive in Drews for the commission of the alleged act, sufficient has already been received in the admission of evidence that he was to receive money for the commission of the alleged crime.

PER CURIAM.—"It is true this testimony does not tend to establish a conspiracy; but it is certainly competent and relevant as to Drews, and in view of the testimony already heard may be as to some of the others, if not all; we cannot anticipate the answer. It is admitted."

The defendants excepted and bill sealed.

Q. Please tell us from whom your father said he was to have $1500 for drowning Raber? · A. To have it from Weise, Hummel, Zechman and Brandt for the drowning of Raber.

2. The court erred in admitting the following offer of testimony on the part of the Commonwealth in the evidence of Elijah Stichler: It is proposed to prove by the witness that Brandt asked him to kill Raber, and said to witness that what Drews promised witness to kill Raber was sure to be paid; that he (Brandt) would give witness a nice thing besides; that Brandt's three co-insurers first intended to kill Raber with chloroform; that they had it under consideration for three months; that after Raber's death Brandt threatened the taking of the life of the witness if he divulged anything; that Brandt told witness that he would have to go to Zechman to get the one hundred dollars offered by Drews. This for the purpose of showing the guilt of Drews and Brandt, and in connection with the other testimony in the case, and to be followed by other testimony showing a conspiracy and procurement on the part of Hummel, Weise and Zechman to have Raber murdered.

Objected to. 1st. This testimony is inadmissible for any other purpose than to affect Brandt and his connection with the supposed crime. 2d. That it is inadmissible to prove a conspiracy on the part of any or all of these defendants. 3d. That there is no proof of such a character as would in law establish a conspiracy or con-

[Brandt v. Commonwealth.]

federation amongst any or all of these defendants, as would allow the court to permit testimony of any one of them to connect them or identify them with the alleged crime. 4th. That so far as Zechman is concerned, there is no proof of his having entered into any unlawful conspiracy with either or any of the defendants, or at any time before. the death of Raber entered into any conspiracy already formed of which there is proof; the testimony offered in regard to him is clearly incompetent, and therefore inadmissible. 5th. The testimony is an attempt to show that Brandt, one of these defendants, offered witness money to kill Raber, which is an entirely different transaction from the one now before the court under the indictment, and therefore is inadmissible to affect Brandt or any or all of the other defendants.

PER CURIAM.—" The evidence is admitted for the purpose of the offer, and will be limited in its effect only to those of the defendants who may be connected with the crime by legal and competent evidence."

The defendants excepted and bill sealed.

3. The court erred in admitting the following offer of testimony on the part of the Commonwealth in the evidence of G. W. Schweinhard: It is proposed to prove by witness that he saw all the parties together at the stable of Brandt, excepting Zechman, after the death of Raber, and that Frank Stichler said he would have to have it to day, as he could not wait any longer. This in connection with the testimony of Lafayette Kreiser, who testified that he saw them at the same time, and that they were talking about money, as a circumstance in the chain to show the guilt of the defendants there present of the crime charged.

Objected to. 1st. In order to prove the guilt of Hummel, Weise and Brandt, or Zechman, they must first show that these men or one of them entered into a conspiracy with Drews and Stichler to commit the alleged offence; and inasmuch as this was after the death of Raber, the declarations of Stichler are not evidence, and, therefore, are inadmissible. 2d. That if the expression was made by Stichler, it is unconnected with any fact tending to establish any crime against any of the defendants, and is therefore inadmissible. 3d. It being evident, from the offer itself, that it was only a detached fragment of a conversation, without any reference or relevancy to the commission of the alleged crime, and would be only giving to the jury a part of the conversation, leaving them to conjecture or imagine as to what it referred to; therefore it is incompetent and inadmissible.

PER CURIAM.—This, in connection with the declarations of Brandt, Weise and Hummel already in evidence, is a circumstance. It may be slight of itself, still as to those present at the time, it is competent to go to the jury. Evidence admitted.

The defendants excepted and bill sealed.

[Brandt *v.* Commonwealth.]

4. The court erred in charging the jury as follows:

"Did these parties, or any of them, conspire with Drews and Stichler to kill Raber? Are they connected in this guilty enterprise by their own declarations?

"Lena Peters testifies that Weise said in her presence 'that father should hurry up the drowning of Raber before Friday or Saturday.' As to Brandt, she says that he said, 'that I was the fault that Stichler and Drews didn't drown Raber sooner.' This was about a week before Raber's death.

"You will also recall the testimony of this same witness (Lena Peters) as to the conversation between Hummel and her father. She says Hummel said: 'That as soon as father had his money he should go away, or else the people would find it out;' and that father said to Hummel that he should be careful what he said about it, and Hummel replied, 'Yes, nobody would get anything out of him.' The subject of this conversation, you will remember, was the death of Raber. The whole of the testimony of this witness should be carefully scrutinized, and these declarations testified to by her should be received by you with great caution. You should be well assured of its truth in the light of the surrounding circumstances of this case, and of the credibility of the witness, before you give to it the effect of truth; for if it is true it intimately associates and connects all three of these prisoners with Charles Drews. Do you believe Lena Peters? Now from this point you will examine the evidence, and perhaps you may have no difficulty, if you start with the truth, the conviction of the truth, of this evidence of Lena Peters in connecting at least these three prisoners—Josiah Hummel, Henry Weise and Israel Brandt—with Charles Drews and Frank Stichler, in the conspiracy to murder Joseph Raber, if you find from the evidence that he was murdered by Drews and Stichler."

5. The court erred in not arresting the judgment for the following reason assigned in support of the motion in arrest of judgment, viz.:

The six defendants were indicted jointly for the crime of the murder of Joseph Raber, as principal felons, while the evidence, if true, disclosed the fact that Charles Drews and Frank Stichler only were actually and constructively present at the time of, and. engaged in, the alleged killing; and that Josiah Hummel, Henry Weise, Israel Brandt and George Zechman, if connected with the crime, were accessories, who had conspired with the said Charles Drews and the said Frank Stichler to kill the said Joseph Raber, and there being no count in the indictment alleging and averring that these four defendants, to wit, Hummel, Weise, Brandt and Zechman were accessories, they therefore could not be convicted as principal felons and judgment must be arrested.

6. The ingredients necessary to constitute murder in the first degree were not proved to exist.

*J. P. S. Gobin* and *W. M. Derr*, for plaintiffs in error.—The court gave a binding instruction to the jury in their direction n regard to the testimony of Lena Peters. The evidence of Lena, with reference to Hummel, was, that after the death of Raber the conversation took place, and there was nothing which Hummel said to indicate any previous connection with the matter. There was no admission or promise to pay from each of them, and no evidence tending to show the minds of all moving with a common design to a common end, and in the absence of such proof, the admission of this testimony made such evidence against all the defendants, simply from what Drews said Brandt told him, and not from what each of them had agreed to pay to him. Yet, coming as it did, it was taken for·granted that it was the separate admission of each to Drews that they would pay the amount, and yet the court said that it is true it does not establish a conspiracy, but is competent and relevant as to Drews, and in view of the testimony already heard, may be as to some of the others. The effect of this evidence went to the jury as an admission of a conspiracy, and the amount to be paid by each of them towards the common purpose. The admission of testimony of Frank Stichler, was equally wrong. The court, without stating that under the testimony a criminal enterprise, in which all or any of them had been connected, was made out, permitted this testimony to weigh against all of the defendants, when it was simply a conversation had by witness with Brandt alone in regard to some different mode of killing Raber, and in regard to his co-insurers, without any evidence showing his authority from them. We cannot discover in this case the ingredients of murder in the first degree.

We contend that the case of Campbell v. Commonwealth, 3 Norris 187, does not apply to this case, and that the authorities on which that case was apparently ruled were those founded on particular statutes in the several states, and that we have no similar law. The indictment should set out the substantive offence with which the accessory is charged.

*Jacob G. Adams*, District Attorney, *Grant Weidman* and *C. P. Miller*, for the Commonwealth.—The jury were bound, if they believed the testimony of the witnesses, to find that the ingredients necessary to constitute murder of the first degree were proven to exist. Was the indictment legal by which six defendants were jointly indicted, without averring in a separate count in the indictment, that Hummel, Weise, Brandt and Zechman were accessories before the fact? This proposition, in all its breadth and magnitude, was before this court in the case of Campbell v. Common-

wealth, *supra*, and the same form of indictment was there used as in the case under consideration.   And this position is supported and sustained by the author of Archbold's Criminal Practice and Pleading, vol. 1, p. 71.   After citing the statute of 11 & 12 Vict., chap. 46, sect. 1, of which our act, sect. 44 is an exact transcript, he says, " In all cases of felony, therefore, the accessory is punishable in the same manner, precisely, as the principal felon."   " And he may now be indicted as a principal—that is, he may be charged in the indictment with having actually committed the offence as principal in the first degree."

Where several are tried together, competent testimony against one cannot be excluded on the ground that it may prejudice the rest: Fife et al. *v.* Commonwealth, 5 Casey 437.

Mr. Justice STERRETT delivered the opinion of the court, February 9th 1880.

The indictment in this case is accurately drawn in the short form authorized by the Criminal Procedure Act.   It charges the plaintiffs in error and four others, as principals, with the murder of Joseph Raber, alleged to have been committed on the seventh day of December 1878.

The right which each of the accused had to demand a separate trial was waived; they elected to be tried together and were all convicted of murder of the first degree.   A new trial was granted to George Zechman; sentence was suspended as to Henry Weise, and judgment was pronounced against the other four—Charles Drews, Frank Stichler, Israel Brandt and Josiah Hummel.   The writ of error was taken by the two last named.

The testimony of the Commonwealth, if believed, tended to prove that Raber was deliberately murdered by two of the prisoners, in furtherance of a nefarious speculation in human life, in which at least some if not all of the others were involved.   It was not alleged that they were all present and actually participated in the killing, but it was claimed that while Drews and Stichler actually committed the murder the others were accessories thereto before the fact; that they had procured policies of insurance on the life of Raber, and then hired the others to kill him in order that they might realize the insurance money.   If the jury believed, as they doubtless did, the testimony of the principal witnesses for the Commonwealth, they could entertain no doubt as to the guilt of Drews and Stichler, or the motive by which they were actuated.   The testimony of one witness was to the effect that, about two weeks before the murder, Drews proposed to give him $100 if he would assist in drowning Raber in Kitzmiller's dam, and explained to him that it could be accomplished by inviting Raber to go fishing with them in a flat, and then throw him out and run the flat over him. Another testified in substance that Drews said he was to receive

[Brandt v. Commonwealth.]

$1500 for killing Raber, and asked him to assist; that, on the evening that Raber was drowned, he saw him in company with Stichler and Drews leaving the house of the latter and going through the field to the creek near by; that when Raber reached the middle of the plank across the creek, Stichler, who was ahead, turned around, put his hands on Raber's shoulders, tripped him and threw him into the water; and in a short time they returned without Raber; that both of them afterwards spoke of the difficulty they had in holding the old man down and drowning him.  Such statements as these appear almost incredible, but the testimony of the two witnesses, to a portion of which only I have thus briefly adverted, was by no means all the evidence on which the Commonwealth relied.  There was an abundance of other testimony, both direct and circumstantial, tending to establish beyond doubt the guilt of Drews and Stichler, and to prove that they were incited by others to the commission of the felony.

But, it is contended by the plaintiffs in error that testimony prejudicial to them was improperly admitted.

The first assignment of error relates to part of the testimony of Lena Peters, a daughter of Charles Drews.  Having testified that her father had stated in her presence and hearing that he was to be paid $1500 for drowning Raber, she was asked to state from whom he said he was to receive the money.  While the learned judge refused to admit the testimony, as tending to prove a conspiracy, he considered it competent and relevant as to Drews, and in view of the testimony then before the jury, he thought it might be competent as to some if not all of the others.  Mrs. Peters had already testified that Weise, one of the prisoners, had said her "father should hurry up the drowning of Raber before Friday or Saturday; that Zechman said he couldn't keep up his policies any longer."  She had also testified that Hummel, in the course of a conversation with her father in regard to Raber, had said, " that as soon as father had the money he should go away from the neighborhood or else the people might find it out;" that her father then said to Hummel that he should be careful what he said to the people about it, and Hummel replied, "yes, nobody would get anything out of him."  The testimony already referred to, as to how and by whom Raber had been drowned, was also then before the jury.  It was undoubtedly competent for the Commonwealth to introduce any testimony that tended to prove the guilt of either of the parties on trial.  Having elected to be tried together, the accused had subjected themselves to the necessary incidents of a joint trial, one of which was the admission of competent testimony against one of them which might incidentally prejudice the others.  They had no right to insist on the rejection of such testimony on that ground: Fife et al. v. Commonwealth, 5 Casey 429.  On several occasions during the trial the learned

[Brandt v. Commonwealth.]

judge took the precaution of saying, that declarations of some of the prisoners were not to be regarded as evidence against others, whose names were incidentally mentioned, unless their participation in the crime was shown by other competent evidence. It has been specially urged as an objection to the admission of Mrs. Peters's testimony, that the alleged declaration of her father was made after the death of Raber. So far as Drews himself was concerned, it could make little difference whether it was before or after; but, from her answer to the question immediately preceding the offer under consideration, it would appear that it was before Raber's death. Having testified to hearing her father say he was to get $1500, she was asked how long this was before the drowning and she replied, "It might have been a week or two before." Speaking of the same matter in another portion of her testimony the impression is conveyed that it was after the death of Raber. It is possible that Drews may have made the statement both before and after, and thus an apparent discrepancy in the testimony might be reconciled; but be this as it may, it was a matter for the jury, and we think there was no error in permitting her to answer the question.

For reasons already suggested we think the testimony complained of in the second assignment was properly admitted. In connection with other testimony then before the jury it tended strongly to prove the guilt of some of the prisoners; and as to the others, it was expressly limited in its effect to those only who might be connected with the crime by other competent evidence.

The third assignment relates to the testimony of Mr. Schweinhard. The court, in admitting it, remarked that, " This, in connection with the declarations of Brandt, Weise and Hummel, already in evidence, is a circumstance. It may be slight of itself, still as to those present at the time it was competent to go to the jury." Keiser had testified that he saw the parties together at the same time, and heard them talking about money. He says, " They were behind the shed and didn't talk that anybody else should have heard it, I think." If, as the testimony would seem to indicate, the subject of their conversation was money, and Stichler said " I must have it to-day, I can't wait any longer," the circumstance, though slight in itself, might properly be considered by the jury in connection with other facts and circumstances in the case. We cannot say there was error in receiving the testimony.

It is contended that a portion of the charge embraced in the fourth assignment was in effect a " binding instruction to the jury that they must believe Lena Peters, and that it was their duty to start out with that truth." We do not so understand the charge; nor do we think the jury could so construe the language of the learned judge, especially when it is considered in connection with what immediately precedes the expression complained of. After

[Brandt v. Commonwealth.]

referring to the testimony of Mrs. Peters the jury were told that the whole of her testimony should be scrutinized, and the declarations, testified to by her, should be received with great caution; that before they gave it the effect of truth they should be well assured, in the light of the surrounding circumstances, of her credibility and the truthfulness of her testimony. Having thus carefully cautioned the jury against hastily accepting her testimony as true, the learned judge appears to have assumed, for the purposes of further instruction, the possibility of their finding it to be true, and then proceeded to indicate the conclusions which, in that event, might be drawn from the evidence. Taking the charge as a whole it was not calculated either to confuse or mislead the jury. In the concluding part of it they were expressly told that none of the testimony should be lost sight of or excluded from their consideration; that the credibility of the witnesses was for them; that all the evidence was submitted to them, and as they found the truth to be so should they declare by their verdict.

The question raised by the fifth assignment of error was fully considered and determined in Campbell v. The Commonwealth, 3 Norris 187; and we see no reason to doubt the correctness of that decision. The 44th section of our Criminal Procedure Act is a transcript of the English statute, 11 & 12 Victoria, ch. 46, sect. 1. Mr. Archbold, in his Criminal Practice and Pleading (vol. 1, p. 71), after quoting the statute, says: "In all cases of felony, therefore, the accessory is punished in the same manner precisely as the principal felon; and he may now be indicted either as a principal—that is, he may be charged in the indictment with having actually committed the offence as principal in the first degree— or he may be indicted as for a substantive felony, or he may be indicted as accessory with the principal, at the option of the prosecutor."

If the jury were satisfied, as they no doubt were from the evidence before them, both as to the fact of the homicide and its grade, it only remained for them to determine who of the other prisoners, if any of them, were shown to be accessories before the fact. They have declared by their verdict that the plaintiffs in error were two of them; and in view of the testimony properly before them we cannot say they were not justified in coming to that conclusion. The theory of the Commonwealth was that some of the prisoners, including Brandt and Hummel, were associated together for the purpose of procuring insurance on the life of Raber, without any apparent motive other than to realize the insurance money payable upon his death; that as soon as they had secured to themselves, as they supposed, assignments of the policies, they set about maturing and carrying into execution a scheme for the murder of Raber; that the first suggestion was "to chloroform him," but finally it was determined to drown him, and for this pur-

pose they hired Drews, who, with the assistance of Stichler, executed the plan. In support of this theory, many facts and circumstances, together with separate acts and declarations of each of the prisoners, were shown, tending to prove that while Raber came to his death by the hand of Drews and Stichler, the plaintiffs in error with others were cognisant of the intended murder, and encouraged its commission. It has not been our purpose to refer particularly to the testimony further than to indicate that there was some evidence tending to connect them with the murder as accessories before the fact.

It must be apparent from what has already been said, that the ingredients necessary to constitute murder of the first degree were proved to exist. The credibility of the witnesses was exclusively for the jury. If they were believed, the body of the offence was clearly proved, and the only serious question was who, besides Drews and Stichler, were the guilty parties. That was a question exclusively for the jury, and after they have passed upon it, and the verdict has been approved by the learned court before whom the case was tried, it is incumbent on the plaintiffs in error to satisfy us that they have just reason to complain of the judgment. This they have failed to do. The assignments of error are not sustained.

> The judgment of the Court of Oyer and Terminer of Lebanon county is affirmed, and it is ordered that the record be remitted to said court for the purpose of carrying the sentence into execution.