## JOHNSON *vs.* THE STATE.

1. Representations, made by a sick person to a medical attendant, of the nature, symptoms, and effects of the malady, under which he is laboring, are admissible as original evidence.

2. The deceased was poisoned on Sunday and from that time until Tuesday evening, when she died, suffered severely from a burning pain in the stomach and bowels. On Sunday night, on Monday, and on Tuesday just before she made a declaration, she used such expressions as, "I cannot stay here—I must go—good people, I am gone," and her medical attendant considered her in extremis from Tuesday morning until she died. Between nine o'clock, A. M. and noon on Tuesday, she asked her medical attendant if he could help her, to which he replied, he thought he could. *Held*—That the inquiry and reply, taken in connection with such strong evidences of a sense of impending death, do not prove any thing beyond the hope of present ease or relief, and are insufficient to exclude the declaration of the deceased.

3. The statement by the deceased of a distinct fact, in no way connected with the circumstances of the death, or the immediate cause of it, is not admissible as a dying declaration.

4. Where a written instrument contains both legal and illegal evidence, the court cannot be required to expunge that which is illegal. If the court points out to the jury the illegal testimony and designates it in such a way that the jury can identify it, it is all that can be required.

5. It is not competent for a witness to give his opinion as to how a person looked at a particular time, as that he looked serious, but he should state the evidences of his mental condition, as that he was habitually lively, but on that occasion was silent, or the like.

6. Silence, indicating unusual seriousness, on the part of one charged as a participant, at or about the time of the commission of the crime, is a fact from which a guilty knowledge may be infered, and evidence of it is therefore admissible. Such a fact, however, of itself, should weigh but little, and ought to be considered with great caution by the jury.

7. On the trial of a prisoner for the murder of his wife, proof, that the prisoner, during the year preceding the homicide, applied to the mother of a single woman for permission to visit her daughter, and was denied it because he was a married man, is admissible, to show a motive for the commission of the crime.

8. And proof, that the wife, for some time prior to her death, had been compelled by the prisoner to sleep in his kitchen, which was very open, and stood apart from the dwelling house in which he and the children lived, is admissible to show both malice and a motive.

9. The crime of murder being divided by the penal code into two grades,

with different punishments, it is necessary, on the conviction of a prisoner for that offence, that the verdict of the jury should ascertain the degree, otherwise no judgment can be pronounced upon it. That the murder was committed by means of poison can make no difference.

Error to the Circuit Court of Chambers. Tried before the Hon. John J. Woodward.

RICE, for the plaintiff:

1. Dying declarations must be confined to "the *circumstances of the death*" and must not consist of mere matters of *belief.* A witness cannot give his *belief.*—2 Barn. & Cres. 608; 2 Phil. Ev.; McLane v. The State, 16 Ala. 674.

2. The evidence of the supposed *previous* attempt to poison the wife, by something called laudanum, was improperly admitted.—Morris v. The State, 8 Smedes & Marsh. 772; Dowling v. The State, 5 ib. 686.

3. The other evidence, relating to the previous conduct and habits, and *appearance* of the prisoner, was wholly inadmissible. (Cases last above cited.)

4. The verdict does not ascertain the degree of the murder and is therefore insufficient. Such a verdict was held insufficient in Tennessee, (7th or 9th Yerger,) although the *indictment charged murder in the first degree.* No charge in the indictment, nor any words used in an indictment, can dispense with the duty of the jury to ascertain the degree of the offence. Cobia v. The State, 16 Ala. 781.

ATTORNEY GENERAL, for the State.

PARSONS, J.—The plaintiff in error was convicted of the murder of Elizabeth Johnson, his wife, by means of poison, at the last term of the Circuit Court of Chambers county. By his bill of exceptions he reserved several questions of law for this court.

There was evidence that the deceased, on Sunday, the first day of October 1848, was taken sick suddenly; that she continued sick until Tuesday, the third day of the same month, when she died; and that on Sunday evening and from that time until her death, she suffered severely, except at intervals. The

evidence tended to show that her death was caused by the white oxide of arsenic, a deadly poison, which was taken by her on Sunday. No physician was called to see her until Monday morning, about 8 or 9 o'clock, when Dr. Buckalieu was called in and examined her. Dr. B. stated as a witness on the trial, among other things, that the deceased complained of some cramp about the region of the abdomen and a burning pain in the stomach; also, of some degree of numbness or partial paralysis about the legs and arms. These complaints were made to Dr. B. on the occasion of his examination of her symptoms and in reply to his questions to her about them. The prisoner's counsel objected to the evidence of her complaints, but it was admitted and the counsel excepted. The representations by a sick person of the nature, symptoms and effects of the malady under which he is laboring at the time, are received as original evidence. If made to a medical attendant, they are of greater weight as evidence; but if made to any other person, they are not on that account rejected.—Greenleaf on Ev. § 102, 3d edit. This exception, therefore, cannot prevail.

The next exception relates to the dying declarations of the deceased. As a ground for admitting them, the State proved by Mrs. Capehart that she saw the deceased on the first, second, and third days of October, and heard her talk on each of those days—that the deceased was very sick all the time and suffering severely from burning pain in the stomach and bowels; that between spells of severe suffering the deceased used the following words: "I cannot stay here—I must go—I cannot live—good people, I am gone." That the deceased used these expressions on Sunday night, on Monday, and on Tuesday, just before the affidavit of her dying declarations was made, and that she died late on Tuesday evening. The opinion of Dr. B. was that she was in extremis from Tuesday morning until her death, late on Tuesday evening. He stated that between nine o'clock, A. M. and twelve on Tuesday, the deceased asked him if he could help her, to which he replied that he thought he could. In the case of the King v. Mary Fagent, 7 C. & P. 238, the prisoner, Mary Fagent, was charged with having killed Avis Fagent. It was proposed, on the part of the prosecution, to give evidence of the declarations of the deceased as declarations in articulo mortis. It appeared, that on

Saturday of the week preceding the death of the deceased, she expressed an opinion that she would not recover, and that she made a declaration; but it also appeared, that after she had made this declaration, she on the same day asked her nephew if he thought she would " rise again." The court held that this declaration was not admissible, but admitted her declarations made afterwards, when she believed her recovery hopeless. But that case is distinguishable from this. She asked her nephew if he thought she would rise again, which implied a hope of recovery. But in this case, the sufferer only asked her physician if he could help her, and the answer was that he thought he could. This, in connection with so much evidence of her sense of impending death, does not prove a hope of any thing beyond present ease or relief. It appears that the deceased made her statement about twelve o'clock noon, on Tuesday. Mrs. Capehart testifies that the deceased continued to use those expressions of her sense of death until just before her statement was made. It is our inference from all the evidence that such expressions were repeated by the deceased, after she asked her physician if he could help her; but without that, we should hold that her inquiry of her physician and his reply were not sufficient evidence, in the present case, that she had, even at that moment, a hope of recovery.

In the case of Oliver against the State, decided at this term, it was held that dying declarations, made under a sense of impending death, are admissible as evidence, where the death of the deceased is the subject of the charge, and the circumstances of the death are the subject of the declarations. The circumstances of this case, already stated, were entirely sufficient, we think, to satisfy the court that the deceased made her declarations, which are presently to be stated, under a sense of impending death, and that therefore they were admissible, so far as otherwise unexceptionable. They were sworn to before a justice of the peace, on the 3d day of October 1848, and the deposition or affidavit contains the following statement of facts: " That Sarah, a negro girl, gave her some wine, and told her that Cullen C. Johnson gave it to said negro, and told said negro, which said negro stated when she presented it to her, that it would do her good—and that on the night before, he, said Cullen, appeared to be friendly with her, which had not

been the case in three months before, or even spoken to her,
and that the said Cullen C. Johnson slept a part of the night
before on the same bed with her, and that after taking said wine,
that she became very sick, and requested some of the children,
or said negro, to go after some person for her and they refused
to go, or even to call in any person to her assistance.   She then
cried aloud for assistance, until Mrs. Capehart heard her and
came to her assistance.   She, said deponent, says she believes
that the said Cullen C. gave it to said negro, for she had seen
the said Cullen give said negro something under the name of
laudanum one time before, which made said deponent very
sick."   The Circuit Court ruled out the words, " and told her
that Cullen C. Johnson gave it to said negro and told said
negro, which said negro stated when she presented it to her,
that it would do her good."   The Circuit Court also ruled out
the words that the prisoner on the night before " appeared to be
friendly."   All the rest of the statements were admitted as
evidence to the jury, to each part of which specifically the de-
fendant's counsel objected.   The belief of the deceased that
the prisoner gave the poison to the negro girl and the statement
of the deceased that she had seen the prisoner, one time before,
give to the same girl something under the name of laudanum
which made deponent very sick, were both inadmissible—the first,
because, generally opinions or belief as evidence are inadmis-
sible—and the second, because what she had seen her husband
give the girl on a former occasion, was not part of the circum-
stances of her death, or of the immediate cause of it, and, under
our statute, it was a distinct felony.   It may have happened
years before, and therefore inadmissible.   But if his former at-
tempt to poison his wife had been proved by a witness on the
trial, the question of the admissibility of the evidence would
have been different.   It might then have been very material to
inquire whether he gave her the poison, for which he is in-
dicted, innocently or criminally.   It is very usual for the head
of a family to administer medicine in the domestic circle, but in
doing so, if he should poison the patient, his intention would be
very material.   In such case, it would deserve consideration if
a former attempt by him to poison the same person might not
be proved, although of itself a distinct felony, for the purpose
of showing his guilty knowledge in the last instance.   Upon an

indictment for maliciously shooting, if it be questionable whether the shooting was by design or accident, proof may be given that the prisoner at another time intentionally shot at the same person.—Russ. & Ry. C. C. 531; 1 Chitty's Crim. Law, 565. But a distinct fact, which forms no part of the case for which the prisoner is indicted, cannot be proved by dying declarations, although when proved it might be evidence to support the indictment. We therefore think there was error in admitting those parts of the dying declarations which related to the belief of the deceased, and her statement in regard to the prisoner's former attempt to poison her.

The prisoner insisted, on the trial, that the portions of the dying declarations which were excluded by the court, should be struck out of the affidavit which contained the declarations. This the court refused to permit, but excluded them by pointing them out to the jury, enclosed in brackets, with directions by the court to the jury not to regard them as evidence. In this way the court permitted the whole affidavit to go to the jury, and the prisoner excepted. In this we can see no error. The observations of the court were sufficient to protect the prisoner against so much as was excluded, and about the identical words that were excluded, there could be no doubt. It often happens that parts of private documents are evidence, but it is clear that the residue of them could not be struck out.

The court admitted evidence that the prisoner on Sunday, the first day of October 1848, went to the house of Wilkins, a neighbor who resided about one mile and a half from the residence of the prisoner, and remained there from about nine o'clock, A. M. until about an hour before sun-set—that whilst at the house of Wilkins, the prisoner "looked serious, although he was habitually a lively man." To this evidence there was an exception. The first part of this evidence was admissible, because it showed the proximity of the prisoner to the place of the crime; and this tends to prove that he could have committed it. The second branch of the evidence, that is, that he looked serious, although he was habitually a lively man, is exceptionable in the mode of proving it. We think that the witness, in strictness, ought not to have been permitted to say how he looked, but rather to state the evidences of his mental condition; as that he was habitually lively, but on that occasion silent,

or the like. If, however, there had been physical indications of a peculiarly disturbed, anxious, or alarmed state of the mind, we do not say but they might be proved.

We cannot say that facts, such as silence, which indicated unusual seriousness at such a moment, are inadmissible as evidence tending in some degree to show the prisoner's guilty knowledge of the condition of his wife, or to show his crime itself. Doubtless such a circumstance by itself should weigh but little and it should be received with great caution, but we cannot say that it was wholly inadmissible. Roscoe, in speaking of the caution with which certain evidence should be received, says, "Not unfrequently a presumption is formed from circumstances which would not have existed, as a ground of crimination, but for the accusation itself; such are the conduct, demeanor and expressions of a suspected person, when scrutinised by those who suspect him."—Roscoe's Criminal Ev. 15. If the conduct, demeanor and expressions of the accused, subsequent to the crime, may be proved as evidence of conscious guilt, although to be received cautiously, it is not obvious why the same indications, at or about the time of the crime, may not be proved for the same purpose. A flight is universally admitted as evidence of the guilt of the accused, though not conclusive. If we take a flight as evidence of fear, and fear as evidence of a known cause of dread or apprehension, we arrive thus at the inference of crime. But it is sufficient perhaps for all practical purposes to regard a flight as immediate evidence of crime, because it betrays conscious guilt. In this instance then, we take the flight, a thing of itself harmless and innocent, as evidence of conscious guilt, a necessary consequence of the crime itself, and the conscious guilt, of which the flight was evidence, is proof, in its turn, of the crime. In this instance, therefore, it is certain that the law admits evidence of the party's conduct, merely to prove his conscious guilt, which is proof of crime. Now this conscious guilt is altogether internal, but the law allows that proof of it which consists of outward signs. Is a flight the only outward evidence of conscious guilt? So far from it, any indications of it, arising from the conduct, demeanor, or expressions of the party, are legal evidence against him. The law can never limit the number or kind of such indications. In the present case, it may be presumed, because this is

consistent with the facts stated in the bill of exceptions, that the poison was prepared by or before nine o'clock, A. M. on Sunday, and that preparations were made for it to be given to the deceased; and it is consistent with the bill of exceptions to suppose that this was expected to be done and was done immediately. About nine o'clock, A. M. on Sunday, the prisoner appeared at the house of Wilkins, a mile and a half from his own residence, and remained there until about an hour before sun-set. If guilty, he had already prepared for the destruction of his victim; the poison, it is probable, was already producing its effects and he was aware of the fact. That was peculiarly the occasion for conscious guilt to reveal some evidence of the crime. If he were unusually serious, or brooding in his mind, or impressed with fear, these were admissible evidences of the crime, upon the same principle that conscious guilt may be proved by a flight. But they ought not to be proved by the opinion of a witness; they can be proved by external indications. "Courts of justice of necessity interpret by external indications the secret workings of the mind; but as such conclusions must in general be inferential merely, they ought never to be made the subject of testimonial opinion."—Wills on Circumstantial Ev. 63.

The State was allowed to prove by Mrs. Rumpy, a near neighbor of the prisoner, that during the year preceding the death of the prisoner's wife, he called Mrs. Rumpy out to her gate and asked her for liberty to visit one of her daughters, and that she refused him the liberty, because he was a married man; and this evidence was excepted to. It was held by the Supreme Court of Connecticut, on the trial of one Watkins for the murder of his wife, that evidence was admissible against him, showing that for some months before and down to the time of the alleged murder, an adulterous intercourse subsisted between the prisoner and a Mrs. Burgess. It was held that such testimony was admissible, not to prove the *corpus delicti*, but to repel the presumption of innocence, arising from the conjugal relation.— The State of Connecticut v. Watkins, 9 Conn. 47. It is stated by a writer that this decision produced surprise.—Wharton's Crim. Law. But the point we have to decide is not the same that was decided by the Supreme Court of Connecticut. If it were, it is probable we should concur in opinion with that court,

and hold also that it was evidence of a motive for the murder of his wife. In this case the prisoner applied to a woman for permission to visit her daughter. There can be no doubt about the criminal object of his visits. He was denied the privilege because he was a married man; there was no other objection. Now, there was an object of desire, of criminal desire, but his wife stood between him and it. This, as a motive for her destruction, was clearly admissible in evidence, because motives for every crime may be proved.—Wills on Cirm. Ev. 57-8; Rosc. Crim. Ev. 95, 697; Clewes' case, 4 C. & P. 221.

It appears by the bill of exceptions that the solicitor proposed the following question to one of the State's witnesses: "Do you know that the defendant paid marked attention to any lady, shortly before the death of his wife? and if so, state in what it consisted." To this question the defendant objected, on the ground that it was leading, &c., but the court overruled the objection and it was answered affirmatively, and the prisoner excepted. This question suggested the answer desired, in respect of the degree of attention paid, and of the time, both of which were material. There are circumstances, however, under which the court will permit leading questions to be put, even to the party's own witness, as where it appears that the witness wishes to conceal the truth, or to favor the opposite party, or if the mind of the witness cannot be directed to the subject of inquiry without a particular specification of it.—1 Stark. Ev. 150-1, and notes. The court must have some discretion upon this subject; but there are no circumstances stated in the bill of exceptions which required a departure from the general rule. The bill of exceptions does not, however, set out all the evidence, so far as appears. But it is not necessary for us to decide whether the record shows error in this part of the case or not, because the judgment must be reversed on other grounds.

It appears by another exception that the State was allowed to prove some particular acts of unkind treatment of the prisoner towards his wife, during the year in which she died; but as it is not stated what they were, we are not enabled to say there was error in that.

The State was permitted to prove that the deceased, for some time prior to her death, had been compelled by the prisoner to sleep in his kitchen, which was about ten yards from his dwell-

ing house and was very open ; and that she was not admitted by the prisoner to live in the dwelling house, where he and their children lived. This was evidence of malice, and therefore admissible. It was also evidence tending, in no inconsiderable degree, to prove that he had become tired of his wife, and hence had a motive for putting her out of the way. It is clear that the crime of wilful murder had been committed by some one. This having been established, and the prisoner being charged with the crime, every ground, from which a motive could arise, may be proved against him. It is not necessary at present to speak of the weight of such a circumstance. All that we have to decide is the question, whether it was admissible as evidence or not. With regard to the grounds from which a motive may be infered, we may remark, that the law has never limited them, and never can limit them in number or kind. And it is immaterial whether the motive be wealth, as if the slayer should become entitled to an estate by reason of the death of the party slain, or to get the party slain out of the way for any other purpose, as to prevent him from giving evidence in a cause. No matter what the object in view, if it can form a motive for the act, it may go to the jury. On the one hand, the jury should receive it always with caution ; but on the other, it need not be such a ground for motive, as might be deemed sufficient to induce a just and honest man to perpetrate a high crime.

In this case the jury did not by their verdict ascertain the degree of murder of which the prisoner was guilty. For that cause, the prisoner moved in arrest of judgment, but his motion was overruled. In Cobia v. The State, 16 Ala. 781, we held that the crime of murder being divided by our penal code into two grades, with different punishments, it was necessary on the trial of an indictment for that offence, that the verdict should ascertain the degree, otherwise no judgment could be rendered upon it. It is now contended by the Attorney General, that as the statute expressly makes homicide by means of poison murder in the first degree, it was not necessary, in this case, for the jury to ascertain the degree. To that it may be answered, that the statute expressly requires the jury to ascertain the degree, without excepting the case of homicide by means of poison. For this and other reasons, we think the degree should have

been ascertained by the jury, and that therefore there was error in overruling the motion to arrest the judgment.

For the errors above noticed, the judgment and sentence of the Circuit Court must be reversed and the cause remanded. The prisoner will, however, remain in custody to abide his trial, or until discharged by due course of law. In the meantime, the appropriate order will be entered in this court, for his being removed from the Penitentiary, and placed in charge of the sheriff of Chambers county, upon the production by said sheriff, to the warden of said State prison, of a duly certified transcript of the judgment of this court, now pronounced, reversing the judgment pronounced against said prisoner by the Circuit Court of Chambers county, under which he is now confined in said State prison.