# Spicer *v.* The State.

## *Murder.*

(Decided June 11, 1914. 65 South. 972.)

1. *Homicide; Evidence; Motive.*—Evidence that defendant had procured insurance upon the life of his wife, payable to himself in the sum of $17,000.00, was admissible as tending to show motive, the prosecution being for wife murder.

2. *Same.*—Where the state claimed that defendant killed his wife in order to collect insurance on her life, the details of the procuring and collecting the insurance, and conversations relative thereto not tending to show guilt or innocence, nor to corroborate or contradict any relevant evidence, is inadmissible.

3. *Same.*—Where it did appear that defendant said that he would fix up his house with the insurance money, it was not competent to introduce statements made by defendant subsequent to the killing of his wife relative to what he would do as to fixing up his house.

[Spicer v. The State.]

4. *Same; Relations Between Defendant and Deceased.*—Where a defendant was charged with killing his wife, evidence as to actual cruelty on the part of defendant towards his wife is admissible.

5. *Same.*—Where defendant was charged with killing his wife, evidence as to his association and relation with other women, or even the desire of such relation, is admissible, if it appears that the wife stood in the way of his gratifying these desires; but words and acts to or towards other women are not admissible, unless they have a certain tendency to show motive.

6. *Same.*—Relations between defendant and other women are not admissible for the purpose of proving the corpus delicti, the charge being wife murder, but are admissible only where there is other evidence to establish the corpus delicti to repel the presumption of innocence arising from the relationship existing between man and wife.

7. *Same.*—Where defendant was being tried for murder of his wife evidence that on one occasion, defendant said to a witness who was walking into church with a young lady unknown to defendant, that if his wife was not there he would take the girl away from the witness; that he advised another witness not to get married, and said that he would not marry any woman the sun ever shone upon; that on another occasion he said, in a laughing way, that if he was not married he would not be, was not admissible in the absence of evidence of a direct nature, to show infelicity between defendant and his wife, or that he was cruel and unkind to her.

8. *Same; Statements by Deceased.*—Evidence as to a statement made by deceased after she had received a mortal wound, which was not a part of the res gestæ of the killing, nor of a dying declaration admitted in evidence, and which did not tend to contradict the dying declarations, was not admissible.

9. *Same; Threats by Third Person.*—Where defendant was on trial for wife murder, and there was evidence tending to show that the wife was shot by a negro boy, and that such boy intended to shoot defendant instead, it was competent for defendant to introduce in evidence threats made by the negro boy towards him.

10. *Same.*—Where the state had introduced evidence tending to show intimate if not criminal relations between defendant and a young woman, and that they were together in an automobile and registered at various hotels, it was competent for defendant to introduce evidence that a brother of defendant and such young woman had had some trouble, and that defendant's brother had procured defendant to carry her away, and that he was doing so when they were seen together, but the details of the trouble between the brother and the young women were not admissible.

11. *Same.*—Where the state asserted as a motive for the killing the obtaining by defendant of the insurance on the life of his wife, evidence that defendant made proof of his wife's death to the insurance company soon after the killing, was properly admitted.

12. *Same.*—The fact that defendant stated at the time that he was making such proof that he was in no hurry to do so, was properly excluded as a self-serving declaration.

13. *Same.*—The details of purchases and exchanges of automobiles by defendant soon after the death of his wife, and what was said

relative to such exchanges and purchases, were not admissible, and was not rendered admissible by a remark of defendant that a particular machine was just right for carrying ladies to ride, or for carrying his children.

14. *Same.*—Where witness did not identify the accused as the man in question, and it was not shown to have had any connection with or relation to the death of the wife, the fact that a man of the same name as defendant was in the house of a certain woman, was improperly admitted.

15. *Same.*—Where defendant was on trial for murdering his wife, and the state had introduced letters written by defendant while in jail, stating that he expected to tell the truth if it broke his neck, defendant should have been permitted to show that at that time he was not charged with killing his wife, but with killing a third person who he had asserted was the murderer of the wife.

16. *Evidence; Motive.*—Motive is an inducement or that which leads or tempts the mind to do or commit the crime charged.

17. *Same.*—The motive for a crime cannot be speculated upon or imagined, and the motive attributed to defendant must have some legal or logical relation to the act charged according to known rules and principles of human conduct; otherwise, it cannot be considered a legitimate part of the proof.

18. *Same; Best and Secondary.*—The warrants and capiases under which defendant was detained in jail at the time he wrote a certain letter, were the best evidence that he had not then been charged with or arrested for the killing of his wife, for whose murder he was then on trial, but that he was being charged with the murder of a third person.

19. *Appeal and Error; Harmless Error; Evidence.*—The fact that accused was permitted to testify to facts which other witnesses were called to prove did not render the exclusion of the testimony of such witness harmless to defendant, since a defendant cannot be compelled to testify, nor to prove his own defense by his evidence alone.

20. *Trial; Inspection of Papers.*—It was not error for the court to refuse to require the state's counsel to turn over to counsel for defendant a slip of paper in the possession of the state's counsel on which defendant had written his name, but which was not sought to be introduced in evidence.

21. *Charge of Court; Covered by Those Given.*—It is not error to refuse charges substantially covered by written charges given.

22. *Jury; Competency; Rejection by Court.*—Under Acts 1909, p. 305, the court cannot properly decline to place upon the lists the names of persons appearing as a part of the venire as to whom no statutory ground of disqualification exists, and who are not excused for some reason personal to the juror, such as sickness.

23. *Same.*—It was not error for the court to excuse of its own motion jurors who were opposed to capital punishment, or who had a fixed opinion.

24. *Same; Qualification; Reading English.*—Inability to read the English language does not disqualify the juror who is possessed of all

the other qualifications prescribed, and is a freeholder or householder (Acts 1909, p. 305).

APPEAL from Covington Circuit Court.

Heard before Hon. A. H. ALSTON. ·

Sam Spicer, Jr., was convicted of the murder of his wife, sentenced to the penitentiary for life, and from such judgment he appeals. Reversed and remanded.

HENRY OPP and 'POWELL & ALBRITTON, for appellant. The court erred in excusing the jurors, for, notwithstanding their answers disclosed cause for challenge, the state may waive its right to challenge, and the court should not have excused them of its own motion.—*Bell v. State,* 115 Ala. 37; *Lyman v. State,* 45 Ala. 78; *Murphy v. State,* 37 Ala. 142; §§ 7276, and 7278, Code 1907. Neither of the Carters were disqualified as jurors.—§ 11, Acts 1909, p. 305. Counsel discuss the evidence relative to insurance policies and the statements connected therewith with the insistence that serious error intervened, and they cite 72 Pa. St. 60; 6 Enc. of Evid. 681-2; *Johnson v. State,* 17 Ala. 625; *Duncan v. State,* 34 Ala. *Liles v. State,* 30 Ala. 24; *Smith v. State,* 9 Ala. 990. These same authorities are cited in support of the contention that the court erred in admitting evidence as to defendant's relations with other women. They insist that the threats made by the negro boy against defendant were admissible in this case, and they cite 6 Enc. of Evid. 751; 30 S. W. 804; 10 Tex. App. 230; *Clark v. State,* 78 Ala. 474. The statement made by deceased was improperly admitted.—*Coles v. State,* 105 Ala. 76.

R. C. BRICKELL, Attorney General, W. L. MARTIN, Assistant Attorney General, and W. L. PARKS, for the State. No error attended the action of the court in excusing the juror.—*State v. Marshall,* 8 Ala. 302; *Tatum*

*v. Young,* 1 Rep. 298; *Farriss v. State,* 85 Ala. 1; *Grif- fin v. State,* 596; *Breeden v. State,* 145 Ala. 1. Under the insistence of the state, testimony as to the insurance and as to defendant's relation with other women was properly admitted.—21 Cyc. 913 and cases cited; *McAdory v. State,* 62 Ala. 159; *Welch v. State,* 97 Ala. 2; *Duncan v. State,* 88 Ala. 34. There is no error in admitting the statement attributed to deceased. —*Shell v. State,* 88 Ala. 17, and authorities supra. Counsel discuss the refused charges, but without further citation of authority.

MAYFIELD, J.—Appellant was indicted, convicted, and sentenced to the penitentiary for life for the murder of his wife.

Deceased was shot with a shotgun, shortly after dark, and about the time she was finishing up her day's work. She had just about finished cleaning up her dining room after supper, and the other members of the family— her husband and two small children—were preparing to retire for the night. At the moment she was shot she was coming off a gallery or porch into one of the rooms. The person who did the shooting was just outside of the house and only a few feet—10 or 15—from the porch.

The deceased, in her dying declaration, described the circumstances of the shooting as follows, according to the testimony of the physician who attended her and dressed her wound: "Mrs. Spicer was suffering untold agony when I got there. She was lying there severely and dangerously wounded, and afterwards died from the effects of the wound. While she was there, right after I got there, she made a statement as to whether she was going to die, I guess you would consider it a statement. She said she was going to die and she was

suffering a great deal. She said she couldn't live. She really didn't make her statement; she didn't do it in what you would say dying declaration, but did it in this way: In speaking of the shooting, she said it was so much better that the negro made a mistake in shooting her than it would have been if he had shot Mr. Spicer, because it would be so much better for her to be taken than him. He could take so much better care of the children than she. She said she couldn't live. She said the negro did the shooting. In a general way, she said the negro was named Joe Green; possibly she said just Joe. My recollection is she just spoke of the negro. Of course it was understood that the balance was known. She didn't say she was standing when she was shot; she said she was coming from the washpan shelf. She said Mr. Spicer was right where he said he was in the house by the fire. She just got up and walked to the washpan shelf; left him sitting there and started to walk back, when the gun was fired.

The witness was here again examined by the attorney for the state, and testified as follows:

"Mrs. Spicer did not tell me that she saw Joe Green shoot her." Being asked by the attorney for the state what Mrs. Spicer said about Joe Green's shooting her, the witness testified as follows:

"It is mighty hard to say; take an event like that, and it is mighty hard to remember remarks passed; but as I stated before, in her talk, understand her condition was about, all the time, from the moment I got there, I began to impress upon her the importance of being quiet, and I didn't let her talk when I could help it, but constantly she would break out, and I remember that distinctly, and she wept over that condition, and said it would be better for Sam to be left with the children than for him to have been taken. She didn't say

she saw anybody shoot her. She said that she didn't see anybody. She said she didn't see who shot her."

The witness was here examined by the attorney for the defendant, and testified as follows: "She didn't say anything about seeing somebody out there at the well. I asked her positively if she saw anybody, and she said that she didn't.

The defendant's description of the shooting was, in substance, that he was preparing to retire for the night, had stepped out of the doors a few minutes before the shooting. He says, among other things: "I went in there and was just talking to my children like I always did. My wife was about her dishes and victuals while I was out, and she was just making preparations to come in when I went in and set down and pulled off my shoes. When I pulled off my shoes, I went and got some water and washed my feet. I washed my feet in the house, by the fire in the bedroom. The children were in there with us, and my wife was in there, too. After washing, I went and threw the water out."

The witness was asked the following questions, and gave the following answers: Q. Where did you throw it out at, Mr. Spicer? A. I went through the dining room is my best recollection, and out the door to the back porch, and threw the water out at the water shelf, and set the pan down, and went on back into the hall and into the bedroom. Yes, sir; my wife's bedroom. Yes, sir; I went through the door that opens into the hall. When I got back in there, my best recollection is, I sat down, and one of the children ran up to me. It was Janie, my little girl. And my wife says to me, 'Sam, did you bring the pan back?' and I said, 'No; I forgot it Nobie; I will go and get it for you if you want me to.' She says, 'No; I will go get it.' Q. When she started out what were you doing? A. Taking my little girl's drawers off,

so she could get on the chamber, and go to bed; and about the time I got them off she had gone out to the water shelf and was coming back. I will have to tell you what she told me. You see, I didn't see her. Q. Go ahead now. A. And she screamed and says, Oh, Sam! somebody shot me,' and I jumped up, and my little girls were in front of me, and stayed in front of me, and I could not run around her as fast as I wanted to, for the little girl was in the way, and when I got to her she was over on all fours like, feet on the doorsill, as near as I can recollect, kind of on her knees, and as I came towards her she had dropped over on her left hip, and I run to her, and says, 'What is the matter, Nobie?' and she says, 'Somebody shot me, Sam;' and I says, 'Nobie, have they hurt you bad?' and she says, 'Yes, Sam; they have killed me;' and I got her in my arms this way, and drug—pulled—her just a little, just a least bit, to where her head would nearly strike this partition wall coming between the dining room and the cook room, right besides the door at the end of the hall, going into the cook room, and the dining table stood a little further from us than the stenographer's table there. I do not remember whether she was trying to pull the door to when I got there. Well, as to what next—the best that I can remember— I have tried to think over it that she spoke of going to faint, and I ran to the mantelpiece and grabbed the camphor and pistol, and as I came back I placed the pistol in my pocket, and pulled out the stopper, and run to her and rubbed some camphor on her. Then I supposed about a minute passed. I raised up and put the pistol in one hand and started out the door, and she said, 'Sam, don't go out there; they will shoot you;' but I threw the screen door open and walked on out in the yard, and I heard a noise, and whirled around, and dashed as hard as I could to the front, and by the time I got between

the two doors in the hall between the large rooms, I fired. Yes, sir; it looked like a man, and I fired, running as hard as I could."

The record presents many close and difficult questions as to the admissibility and relevancy of evidence. While no entirely new rules of evidence are involved, the application of old rules to new circumstances and conditions is involved. As to some of the questions we are unable to find authorities exactly in point, and can therefore appreciate some of the difficulties which the trial court and counsel have encountered in this case.

Special counsel was employed in the prosecution of the case in the lower court, and, on appeal, in this court. The case has been fully and ably argued by counsel both for the state and for the defense, and their presentation thereof has greatly aided us in our examination of the record.

The state contends that the evidence tends to establish one of three theories: (1) That the defendant used the negro boy, Joe Green, to place the gun and did the shooting himself; (2) that the defendant procured the negro boy, Joe Green, to do the shooting, and defendant then killed Joe Green to suppress his testimony and conceal the crime; (3) a conspiracy between defendant and Joe Green to kill Mrs. Spicer in order to procure the $17,000 of insurance on the life of Mrs. Spicer in favor of the defendant, defendant agreeing to make some division of the proceeds with Joe Green.

The evidence is voluminous. It consists of nearly 300 pages of closely typed matter. The evidence takes a very wide range. It is admitted by the state, and was so charged by the court to the jury, that the evidence to show the defendant's guilt was wholly circumstantial.

There were scores of exceptions and questions reserved as to the admission and the rejection of evidence.

All these have been examined, but it is impossible to treat each exception separately. We will, of necessity, have to group the objections and exceptions touching the evidence, and treat each class merely.

On the trial the state sought to prove, and did prove, that the defendant had procured several policies of insurance, in his favor, on the life of his wife; such policies aggregating about $17,000. This fact was admissible as tending to show motive on the part of defendant to take the life of the insured—deceased.—Wills on Circum. Ev. pp. 154e, 120 359g, and authorities cited; *Com. v. Clemmer,* 190 Pa. 202, 42 Atl. 675; *Com. v. Robinson,* 146 Mass. 571, 16 N. E. 452; *State v. Rainsbarger,* 74 Iowa, 196, 37 N. W. 153; *Brandt v. Com.,* 94 Pa. 290.

The trial court, however, allowed the state too much latitude in proving every detail connected with the procuring and collecting of the insurance policies. Many of these details were wholly irrelevant to any issue in the case, and could have no other effect than to either bias the jury or distract their minds from real issues to immaterial ones. For example, the state, over the objection of the defendant, was allowed to prove every conversation of the accused having the least reference to the insurance, though it tended to show neither guilt nor innocence, nor to corroborate or to contradict any relevant evidence.

One B. B. Kilpatrick, a brother-in-law of defendant, was allowed to testify: "He [defendant] didn't say anything about what he was going to do with the insurance money, but he told me how he was going to fix up the house; he didn't say whether he would do it with the insurance money or not."

Witness was then asked the following question: "What did he say about that?"

After objection by the defense for illegality, etc., which objection was by the court overruled, witness stated in reply: "He stated to me that he was going to have the front part of his fireplace chiseled off, and have tiling fixed on each fireplace, and when the flies specked the other room a little more that he was going to wall-paper it, and that he was also going to wallpaper his dining room with paper that had gool-looking fruits and vegetables, something good to eat—looked pretty nice." Here counsel moved to exclude this answer to the question last hereinabove objected to, on the same grounds assigned to the question. The court overruled said motion, and to the action of the court, in so overruling said motion, the defendant then and there duly and legally excepted.

This matter was, of course, wholly irrelevant; it could have no legitimate bearing on the issues. It had no tendency to show guilt or innocence, nor to contradict or corroborate any other evidence. Its effect was to distract the minds of the jury from the real issue to that of whether or not it was proper for a man to improve his house after his wife is killed, whether by himself or some one else.

The rule is well stated as follows: "Presumptions or inferences may be, and often are, founded on circumstances which, of themselves, independent of the accusation, would not be ground of crimination. It is largely a question of fact, rather than a question of law, for the determination of the jury, whether particular conduct, or particular expressions of the accused, refer to a criminal offense, and spring from his consciousness of guilt. When it is clear that they have no relation to the offense, and that they ought not to have any influence with the jury, it is the duty of the court to reject them as evidence. But, however minute or insignificant they may

be, shedding but a dim light upon the transaction, if they have a tendency to elucidate it, they must be admitted. They may be connected with other circumstances which will constitute a chain of evidence, leading the mind to a satisfactory conclusion.—*Johnson v. State*, 17 Ala. 624; *Campbell v. State*, 23 Ala. 45; *Liles v. State*, 30 Ala. 24 [68 Am. Dec. 108]." *McAdory v. State*, 62 Ala. 154, 159.

The state was also allowed too much latitude in proving, in the most minute detail, various acts and words of the defendant, in connection with and relation to other women than his wife. Where a man is on trial for the murder of his wife, acts of cruelty, and even of infidelity, on his part to her are admissible in evidence against him, if they are so related to or connected with the killing as to show a probable motive on his part to kill her. The illicit association and relation of the husband with other women, or even the desire of such relation, may be proven by the state on such trials, if it appears that the wife stood in the way of his gratifying that lust; but every word and act of a man to or toward other women than his wife are not so admissible in evidence, unless such words or acts have some certain tendency to show a motive for the husband to kill the wife; and, of course, there must be some other evidence tending to show that the husband did kill the wife, or that she was killed by some unlawful agency of his. Such evidence is not admissible to prove the corpus delicti, but to repel the presumption of innocence arising from the conjugal relation.

The first utterance of this court on this subject was in the case of *Johnson v. State*, 17 Ala. 618. In that case the court said: "The state was allowed to prove by Mrs. Rumpy, a near neighbor of the prisoner, that during the year preceding the death of the prisoner's wife

he called Mrs. Rumpy out to her gate and asked her for
liberty to visit one of her daughters, and that she re-
fused him the liberty, because he was a married man;
and this evidence was excepted to.  It was held by the
Supreme Court of Connecticut, on the trial of one Wat-
kins for the murder of his wife, that evidence was ad-
missible against him showing that for some months be-
fore and down to the time of the alleged murder an adul-
terous intercourse subsisted between the prisoner and a
Mrs. Burgess.  It was held that such testimony was ad-
missible, not to prove the corpus delicti, but to repel
the presumption of innocence, arising from the conjugal
relation.—*State of Connecticut v. Watkins*, 9 Conn. 47
[21 Am. Dec. 712].  It is stated by a writer that this
decision  produced  surprise.—Wharton's  Crim.  Law.
But the point we have to decide is not the same that was
decided by the Supreme Court of Connecticut.  If it
were, it is probable that we should concur in  opinion
with that court, and hold also that it was evidence of a
motive for the murder of his wife.  In this case the pris-
oner applied to a woman for permission to visit her
daughter.  There can be no doubt about the criminal ob-
ject of his visits.  He was denied the privilege be-
cause he was a married man; there was no other objec-
tion.  Now, there was an object of desire, of criminal
desire, but his wife stood between him and it.  This, as
a motive for her destruction, was clearly admissible in
evidence, because motives for every crime may be
proved.—Wills on Crim. Ev. 57, 58; Rosc. Crim. Ev. 95,
697; Clewes' Case, 4 C. & P., 221.  It appears by the bill
of exceptions that the solicitor proposed the following
question to one of the state's witnesses:  Do you know
that the defendant paid marked attention to any lady,
shortly before the death of his wife, and, if so, state in
what it consisted?'  To this question the defendant ob-

jected, on the ground that it was leading, etc., but the court overruled the objection, and it was answered affirmatively, and the prisoner excepted. This question suggested the answer desired in respect of the degree of attention paid and of the time, both of which were material. There are circumstances, however, under which the court will permit leading questions to be put, even to the party's own witness, as where it appears that the witness wishes to conceal the truth, or to favor the opposite party, or if the mind of the witness cannot be directed to the subject of inquiry without a particular specifiction of it.—1 Stark. Ev., 150, 151, and notes. The court must have some discretion upon this subject; but there are no circumstances stated in the bill of exceptions which required a departure from the general rule. The bill of exceptions does not, however, set out all the evidence, so far as appears. But it is not necessary for us to decide whether the record shows error in this part of the case or not, because the judgment must be reversed on other grounds."

Another case is that of *Duncan v. State*, 88 Ala. 31, 7 South. 104, in which such evidence was held admissible. The facts and circumstances given in evidence in that case were as follows: "Alex Dean, a witness for the state, testified to a conversation had by him with the defendant, while standing at the place where the grave was dug, on the evening of the day of his wife's death (Thursday), in which defendant told him 'he was going to do something that might be a leap in the dark, but he was going to risk it' and asked him to take a note to Georgia Balderee, and a message asking her to meet him Saturday evening 'at the big gate near the plum tree,' that he was to go to the house, 'and take up a book, and ask her if it was hers, when she would understand, and he was to give her the note.' The witness further tes-

tified that, 'about three or four weeks' before the death of Mrs. Duncan, he had another conversation with defendant, in which the latter told him of an interview between himself and Georgia Balderee, in which he advised her not to marry one Miller, unless she loved him; that he asked witness, 'What would you think if she gave me to understand that she loved me better than any other man?' and witness answered, 'That he would not be surprised.' The defendant moved to exclude this conversation from the jury as evidence, 'on the ground that it was irrelevant and misleading'; and he excepted to the overruling of his motion.

"J. S. Judah, a witness for the state, testified that he had a conversation with defendant on Friday, the day after his wife's death, in which defendant asked him 'to carry him and the Balderee woman to Ozark the next night to marry,' but witness refused; that defendant 'then set the next Thursday,' but on Saturday, 'after going to Balderee's,' he came to witness and told him 'they had decided to leave on Saturday night, and would probably go to Headland.' The defendant moved to exclude from the jury 'what was said about marrying the Balderee woman,' and he excepted to the overruling of his motion. William Windham, another witness for the prosecution, testified that, 'about two months before the death of the defendant's wife, he heard defendant say that the Balderee woman was a nice, pretty girl, and that he would like to have her.' The defendant objected, and excepted to the admission of this evidence. The prosecution proved, also, that the defendant and 'the Balderee woman' ran off together on said Saturday night, but were pursued by her father and others, overtaken in Florida, and brought back; and the defendant admitted, in his statement to the jury, that he intended to marry the girl the next day after they were overtaken and brought back."

The court said of that ·evidence: "Many exceptions were reserved in this case, but they naturally resolve themselves into two groups: First, the conduct and conversation of the defendant in reference to the girl Georgia Balderee, done and had both before and after the death of Mrs. Duncan; and, in this connection, the conduct and remarks of the defendant, tending to show dissatisfaction with his wife, for whose murder he was tried and convicted. Each and all of this testimony was competent and legal, as tending to prove a motive for the commission of the offense.—*Baalam v. State*, 17 Ala. 451; *Johnson v State*, 17 Ala. 618; *Hall v. State*, 40 Ala. 68; Id., 51 Ala. 9; *Marler v. State*, 67 Ala. 55 [42 Am. Rep. 95]; Id., 68 Ala. 580; *Phillips v. State*, 68 Ala. 469."

In *Marler's Case* the accused was not indicted for killing his· wife, but for killing a third party who was, or would be, a witness against the accused, in a divorce proceeding. The court in that case said: "The state was permitted to prove by Jacob Redman, against objection, the fact that the prisoner, Marler, stated to him that 'he was tired of his wife, and intended to get a divorce from her, and·he (Marler) wanted his (Redman's) permission to marry his daughter.' This was competent, we think, to prove motive. The deceased, Dr. Colquitt, was an· important witness in the divorce suit instituted by Marler against his wife. The evidence tended to· show that Marler's imputed purpose, in his alleged complicity in the killing, was to get rid of deceased as an obstacle to his success in obtaining such divorce. This motive, if, in fact, it existed, was material to strengthen the probability of his guilt. If he wished to marry Redman's daughter, this might intensify the desire for a divorce, and this again tend to quicken eagerness to destroy the witness."

In *Baalam's Case,* 17 Ala. 451, this court, as to the admissibility of evidence to show malice, said: "The prosecutor then offered a witness to prove that the deceased and the prisoner were husband and wife, and about a year previous to the homicide they had quarreled and separated, but it was not shown that there had been any quarrels between them since the separation, or that they ever were reconciled. To this testimony thus offered the prisoner objected, but his objection was overruled. This evidence was exceedingly remote, and entitled to but little weight from the jury in coming to a conclusion as to the guilt or innocence of the prisoner, but we cannot say that the court erred in admitting it. When it is shown that a crime has been committed and the circumstances point to the accused as the guilty agent, then proof of a motive to commit the offense, though weak and inconclusive evidence, is nevertheless admissible.—1 Stark. Ev. 502, Wills on Presump. Ev. 56. On the other hand, the total absence of all motive or reason why the accused should do the act must always operate strongly in his favor, when the inquiry is whether the accused perpetrated the deed, and the evidence to prove his guilt is circumstantial only. But it must be apparent that, if a motive be evidence in such cases to be weighed by the jury, then evidence tending to prove the existence of the motive cannot be rejected. It may, however, be well to remark that a jury cannot be too cautious in attaching importance to such evidence; for, if the motive itself is a weak and inconclusive circumstance, how much less conclusive is the evidence which only tends to prove the existence of the motive? Such evidence, however, cannot be wholly rejected; it must go to the jury, but they should be guarded as to the importance they attach to it."

So the rule is that any evidence which tends to show motive, however slight, is admissible, but that courts

and juries should be cautious in its use. There are, however, limitations upon this rule, as general as it is. Every act, word, or deed of a man, for several years previous to the crime, and for months thereafter, is not admissible to show motive. Motive is an inducement, or that which leads or tempts the mind to do or commit the crime charged. The law does not deal with motive in a speculative sense. The motive may not only be material in some cases it may be by the jury considered controlling; but it cannot be speculated upon or imagined any more than other circumstances. The motive attributed to the accused must have some legal or logical relation to the act charged, according to known rules and principles of human conduct. If the motive has not such relation to the crime charged, it cannot be con sidered a legitimate part of the proof. If a given circumstance has no tendency whatever to prove a given motive, it is, of course, not admissible. The principles of the law of evidence that should govern criminal trials, which were stated by Lord Erskine, are applicable to evidence to show motive. He said that these principles are "founded in the charities of religion, in the philosophy of nature, in the truths of history, and in the experience of common life."—24 How. St. Tr. 966.

The limitation upon the rule as to the admissibility of such evidence is well stated by the Supreme Court of Massachusetts in the case of *Com. v. Abbott,* 130 Mass. 472. It is there said: "It is a cardinal rule governing the production of evidence that the testimony offered must correspond to the allegations, and be relevant to the issue on trial. It is not necessary that the evidence should bear directly on the issue. It is sufficient if it tends to establish the issue or constitutes a link in the chain of proof. But, in order to be admissible, it must either alone, or in connection with other evidence pro-

[Spicer v. The State.]

duced, be capable of affording a reasonable presumption or inference as to the principal fact in dispute. The rule excludes all collateral facts which tend to divert the mind from the real question, and are calculated only to prejudice and mislead the jury. The existence of a criminal motive is an element which it is often necessary to establish in order to give character to the acts and conduct of a party charged with or suspected of crime. In such case the conduct or declarations of a party, both before and after the principal fact in issue, are admissible, provided they are sufficiently near in point of time, and sufficiently significant of the motive or intent to be proved. The rules which govern human conduct are to be reasonably applied in these cases, as in all other investigations of fact."

Applying those general rules to the case then in hand, the court said: "It was clearly competent for the defendant to prove that he did not commit the murder, by showing that some other person did; and, as one step towards that end, he had a right to prove such a state of ill feeling on the part of the husband, existing at the time of the homicide, as would furnish him with a motive for the commission of the crime. But the difficulty is that the ill feeling here offered to be shown was not of such a character as to afford a reasonable ground for the inference that it existed at the time of the murder. It is to be considered in connection with the important fact that during the time covered by the evidence— namely from 1873 to 1877—the parties lived together as husband and wife, and continued so to live together as long as she lived. There was no evidence offered of the continuance or existence of any ill feeling, or of any occasion for ill feeling, after the removal from Lexington in 1877 to the time of her death in 1880. The whole evidence fails to show such deeply seated and enduring

hostility on the part of the husband as to lead to the presumption that, without further manifestation, and under the concealment of kindly relations, it continued to exist and so increase in power as to furnish a motive for the commission of the crime."

We are not prepared, however, to sanction the doctrine that mere lapse of time alone would render evidence to show motive inadmissible; this would go rather to its weight and sufficiency than to its admissibility. Certainly such has been the holding of this court.

There was evidence in this case that the defendant had had improper relations with other women than his wife, and that he had traveled about with one of these in an automobile, and that they each registered at certain hotels. These, and similar facts, were admissible as having a natural tendency to show motive. But the trial court allowed the state entirely too much latitude in this respect, over the objection of the defendant; circumstance after circumstance was admitted, over defendant's objection, which had no possible tendency to prove motive, criminal intimacy with other women, infatuation, or lust, or even admiration for them, much less to show a desire to rid himself of his wife so that he might gratify his desire as to such women. We will mention a few examples of such testimony:

A witness, Caton, was examined, and was allowed to detail a conversation which he had had with defendant about a young lady. The substance of this conversation was that, the defendant and witness being at a camp meeting, and witness walking into church with a young lady whom it seems the defendant did not know, defendant said to him that if his wife was not there he would take the girl away from witness.

Another was the conversation between J. S. Mulkey and the defendant, to the effect that defendant advised

witness not to get married; that if the defendant was in witness' place he would not marry any woman the sun ever shone upon.

Another was the conversation with the witness Snowdon, in which the defendant said, in a laughing way, that "if he was not married he wouldn't be."

There was no direct evidence in this case to show infelicity between the defendant and his wife; such evidence as this was entirely too remote and too far-fetched to be admissible to show motive on the part of the husband to kill his wife. Such remarks are frequently made by married men in pleasantry, and certainly do not tend to show motive on their part to take the life of their wives; they are often made in jest, or merely casually, as these were shown to have been made, without tending in the slightest to show domestic infelicity.

There was no direct evidence in this case that the defendant was cruel or unkind to his wife. That coming nearest to doing so, showing the worst phase of his conduct towards her, was the testimony that on one occasion he cursed her or cursed in her presence. The witness swore both ways as to that.

The testimony as to the domestic relations between the defendant and his wife, detailed by the father of his wife on cross-examination by the state, was in part as follows:

"The defendant's treatment of my daughter was good. I never knew of his being unkind to her at all. Three of her children were born at my place. The little girl, Janie, was born there. Sam was there when she was confined, and gave her every attention. As far as his treatment of her is concerned, it was good enough. He always tried to provide for her and carry her in style, and to make a good living for her and the children. He appeared to like his children very well. The treatment

of my daughter towards her husband was kind and affectionate. She was loving towards him. I never saw anything take place between them that indicated at all that they were uncongenial. I don't know of any serious difference that ever occurred between them. My daughter made a statement to me as to who it was she thought shot her."

The trial court also fell into error in allowing the state to prove by Mrs. Hamby a conversation she had with the deceased the day after the shooting. This was not offered as a dying declaration nor as a part thereof. It is claimed by the state that it was admissible to contradict the dying declaration of the deceased. If this evidence had tended to contradict the dying declaration, it would have been admissible, under the rule declared in *Shell's Case,* 88 Ala. 14, 7 South. 40.

We fail to see how the testimony of Mrs. Hamby, as to what deceased said to her, tends in the slightest to contradict the dying declaration of deceased. Every word said in both statements by the deceased could be true. The dying declaration in this case was proven by the state's own witness. It is true that most of it was brought out by the defendant, on the cross-examination of the state's witness, the doctor who dressed her wounds and attended her. This purely hearsay evidence was not a part of the res gestæ of the killing, nor of the dying declaration, nor was it offered as such. The defendant was shown not to be present, and, of course, was not bound by such testimony.

It is contended by the state that the evidence tended to show that defendant was not in the house when the shooting occurred. We fail to find any such tendencies, unless it could be said that the mere fact that her statement *did not affirm that he was in the house* tended to show that he was outside. The statement did not pur-

[Spicer v. The State.]

port or attempt to account for the presence or the absence of defendant at the time of the shooting. The mere fact that a part of the statement was to the effect that the little girl was the first to get to the deceased did not at all show that the defendant was not in the house, nor to contradict the dying declaration.

It was also error to decline to allow the defendant to prove threats, on the part of Joe Green, the negro boy, to kill the defendant. There was evidence in this case, and properly so, to the effect, or which would authorize the jury to find, that the negro boy killed the deceased through a mistake of identity; that is, that the boy intended to kill the defendant, and not the deceased.

It is very true that it is not permissible for the defense to prove threats on the part of a third party to kill the deceased, when there is no evidence tending to show that such third party, and not the defendant, killed the deceased; but the rule is different where there is other and independent proof going to show that such third party actually killed the deceased. See Wills on Cir. Ev. p. 237p. where the rule is thus stated:

"Courts generally do not allow the accused to introduce evidence that third persons had threatened to do the act in question; although it cannot be doubted that proof that a third person did the act in question excludes the conclusion that the accused did it; and if threats by the accused tend to show that he did the act, then why should not threats of third persons tend to show that they did it? The reasons given for excluding such testimony are various. See *State v. Beaudet,* 53 Conn. 543, 4 Atl. 237, 55 Am. Rep. 155; *Schoolcraft v. People,* 117 Ill. 271, 7 N. E. 649; *State v. Fletcher,* 24 Or. 295, 33 Pac. 575; *State v. Crawford,* 99 Mo. 74, 12 S. W. 354; *Carlton v. People,* 150 Ill. 181, 37 N. E. 244, 41 Am. St. Rep. 346. But see *Alexander v. U. S.,* 138 U.

S. 353, 11 Sup. Ct. 350, 34 L. Ed. 954, and *Worth v. R. R. Co.* (C. C.) 51 Fed. 171, where such evidence was admitted. The defendant cannot show that others had threatened to kill the deceased in the absence of any other evidence tending to connect such others with the homicide in question (*Woolfolk v. State,* 81 Ga. 551 [8 S. E. 724] ; *State v. Mann,* 83 Mo. 589 ; *State v. Duncan,* 28 N. C. 236 ; *Henry v. State* [Tex. Cr. App.] 30 S. W. 802) ; but, in connection with such other evidence, threats by the third persons may be proved (*Morgan v. Com.,* 77 Ky. [14 Bush] 106) ; also where the evidence against the defendant is entirely circumstantial (*Murphy v. State,* 36 Tex. Cr. R. 24 [35 S. W. 174] ; *Leonard v. Terr.,* 2 Wash. T. 381 [7 Pac. 872])."

In *Morgan's Case,* 77 Ky. (14 Bush) 106, it is said: "We therefore are of opinion that when, on the trial of a man for the commission of a crime, the proof is con flicting as to whether he or another person perpetrated the offense, the prisoner has the same right to show the conduct, acts, and motives of the other, that the commonwealth has to show the conduct, acts, and motives of the prisoner, and that the evidence of the feelings of Conn toward the deceased, as evidenced by previous threats and personal conflicts, should have been permitted to go to the jury."

The books show that such evidence is, for a greater reason, admissible when the evidence, as in this case, is wholly circumstantial against the accused. The state insists that this was error without injury, because the accused was himself allowed to testify to such facts. We cannot agree that, if error, it was without injury for that reason. To restrict a defendant to proving his defense by his own evidence is both error and injury.

While the threats offered to be proven in this case were not threats to kill the deceased, but to kill the de-

fendant, there was proof that the person who made the threats intended to kill the defendant, and not the deceased. It has been held by this court that, where the defendant killed one whom he did not intend to kill, his threats to kill another person—the one whom he thought he was killing—are admissible.—*Clarke v. State*, 78 Ala. 474, 56 Am. Rep. 45. For similar reasons we think that the evidence of threats to kill the defendant, by the negro, Joe Green, was admissible.

We are also of the opinion that it was error to decline to allow the defendant to prove by his brother that the latter had employed the former to carry the young lady, Miss Harper, away, on account of trouble between the young lady and the defendant's brother. The state had introduced a great deal of evidence to show intimate, if not criminal, relations between the defendant and this young lady, for the purpose of showing motive on the part of defendant to kill his wife. This evidence offered by the defendant tended to rebut the presumption that defendant's associations with this young lady were on account of intimate relations between them, or of any infatuation, of one for the other; and to prove that they were on account of trouble between the young lady and the defendant's brother. It tended to account for the defendant's being with her in the automobile, and for the two having registered at various hotels. The defendant ought certainly to have been allowed to show or explain the circumstances under which, on these occasions, he was found in the company of this young lady. The state insists that, if this was error, it was cured by allowing the defendant himself to testify to substantially what he proposed to prove by his brother. If it was competent evidence, in rebuttal of the evidence offered by the state—and we feel sure that it was—then the court could not restrict the defendant to proof of

the facts by his own testimony. The court has no right to compel the defendant to testify in his own case.

Some of the proof of the details of the brother's trouble with the young lady was not admissible, and the court properly declined to allow such proof; but the facts that he had had trouble with her, and that he had employed defendant to carry her away, and that defendant was on this journey—this mission—when seen in the automobile and at the hotels with this young lady, were admissible; and it was error to restrict or limit the jury to the testimony of the defendant himself.

There was no error in declining to require the state's counsel to turn over to the defendant's counsel the slip of paper on which Spicer had written his name. It was not offered in evidence, and defendant's counsel had no right to see it.

There was no error in allowing the state to prove that defendant made proof of the death, soon after the killing of his wife, to the insurance company, nor in declining to allow defendant to prove that he stated to the insurance agents that he was in no hurry to make the proof.

It was error, however, to allow the state to go into the details of the defendant's purchasing and exchanging automobiles, and thus to prove everything the defendant said and everything the agents said. None of this testimony had anything whatever to do with any issue involved in this trial. The remarks of the defendant that a particular machine was just right for carrying ladies to ride, or for carrying his children, did not make such evidence relevant. It served only to incumber the record and to distract the minds of the jury from the real issues involved on the trial.

It was likewise error to allow the state to prove, by one Davis, that he saw a man in the house of a woman

by the name of Berry, and that the man's name was Spicer. The witness was not able to identify the defendant as the man, and, if he had been, the occasion was after the death of his wife, and the circumstance was not shown to have the slightest connection with, or relation to, the death of defendant's wife. It was wholly irrelevant and immaterial, and was highly calculated to prejudice the jury against the accused.

The state offered letters written by the defendant while in jail, in which he stated he expected to tell the truth if it broke his neck. The defense then offered to prove that, at the time one of the letters was written, defendant had not been accused of killing his wife, but was in jail on the charge of killing the negro boy, Joe Green, who, the defendant says, killed his wife. The court declined to allow him to make proof of this fact by the warrants and the capias under which he was then in jail. This, we think, was error. These documents were the best evidence of the charges under which the prisoner was held, and of the dates of his arrests and confinements. And if, at the time he wrote the letters, he had not been charged with, or arrested for, the killing of his wife, but had been as for the killing of the negro boy, this was a circumstance tending to show that it was the killing of the negro, and not the killing of his wife, to which he referred in his letter.

There are many other errors as to rulings on testimony insisted upon by counsel for the defense, but we deem it unnecessary to further treat them in detail; all fall within one or another of the classes above treated.

We find no error as to the charges or instructions of the court. The charges refused to the defendant were either bad, misleading, or covered by other charges given at the request of the defendant.

As the case must be reversed, it is not necessary to particularly pass upon questions touching the organization of the jury, further than to say that, in capital cases, the mode of selecting the jury of 12 from the special venire is changed by the new jury law from what it formerly was. The jury is now selected by the parties by their alternately striking from a list furnished by the court until 12 only remain; whereas, before it was selected by the parties by their challenging for cause, or peremptorily, those persons presented, until 12 were selected. It is now made the duty of the court to pass upon the competency of those persons appearing, in order that a list may be made out from which the parties are to alternately strike, the state as well as the defendant, as the statute directs. It is possible that this statute may change the rule as to the court's excusing ex mero motu those who are subject to challenge for cause only by the parties, and which might be waived, illustrated in the decisions in *Bell's Case,* 115 Ala. 37, 22 South. 526, *Murphy's Case,* 37 Ala. 142, and *Lyman's Case,* 45 Ala. 78; though as to this we do not now decide. It is certain, however, that the court cannot decline to place upon the list from which the parties are required to strike the names of persons appearing as a part of the venire and who have not been properly excused from such service; except for some cause which disqualifies such persons from serving on that case. That is to say, the law fixes the qualifications of jurors, and not the court. The court can, and must, pass upon questions of fact touching whether or not the persons appearing possess the qualifications which the law prescribes; but the court cannot add to nor take from the qualifications which the law fixes.

We are not, of course, speaking in reference to the statutes which authorize the court to excuse any per-

son from serving as a juror for the term, or upon a particular trial, for some reason personal to the juror so excused, such as the sickness of the juror or of some member of his family, or other personal exigency; but we are now speaking of the power of the court to decline to place upon the list the names of persons appearing, and not so excused, for some reason for which the law does not disqualify such person as a juror in the particular case.

The rules are of necessity different in capital cases, which the law directs must be tried by special venires, and not by the regular ones. This was well pointed out by BRICKELL, C. J., in *Phillips v. State*, 68 Ala. 474, where it was said: "The purpose of the statute cannot be misunderstood. The accused has not a right to be tried by such jury as may be selected from the body of the county, but by a jury selected from the list served upon him, so far as was practicable. It is intended that, as to the persons summoned, he shall have full opportunity of ascertaining whether causes for challenge exist, and also to inform himself as to whom, if any of them, he should exercise the right of peremptory challenge.— *Parsons v. State, supra* [22 Ala. 50]. Of what avail is the right, if, without sufficient cause, the court can discharge from service persons who have been summoned and drawn? Where is the limit of the power of the court, if it can be exercised as to one such person? It could be exercised until the list was exhausted, and thus the prisoner driven to the selection of a jury from talesmen summoned from the body of the county, as to whom he could not intelligently exercise the right of challenge, either for cause, or peremptory. It is an error fatal to a judgment of conviction, when it appears the court has by its action denied, impaired, or dimin-

ished this right of the accused.—*Parsons v. State, supra; Boles v. State,* 13 Smedes & M. [Miss.] 398."

In this case some of the jurors were excused because they were opposed to capital punishment, and one because he had a fixed opinion. The statute makes venire-men subject to challenge for cause, and it would seem that it was not error for the court, on its own initiative, to excuse these jurors and not put them on the list from which the parties were required to strike; the new jury law probably working a change in this respect.

One of the jurors excused was not a householder or freeholder of the county, but he could read; another was a householder and freeholder, but could not read English. In this it would seem there was error, because the present statute does not appear to make both conditions—that is, householding or freeholding, and ability to read English—a qualification of a juror. In fact, the statute expressly provides that, if a person cannot read English, yet, if he has all the other qualifications prescribed and is a freeholder or householder, his name may be placed on the jury roll and in the jury box. This state of facts would seem to qualify him as a juror, and the court could not ingraft other qualifications upon those prescribed by the statute, and certainly could not excuse one whom the law says is qualified. See Acts 1909, p. 305.

For the errors pointed out, the judgment must be reversed, and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and SOMERVILLE and GARDNER, JJ., concur.